(December 18, 1902.)

## TUCKEY v. LOVELL.

### [71 Pac. 122.]

DEBTOR AND CREDITOR—VOLUNTARY GIFT.—The law requires that debtors should be just before they are generous, and under this rule a debtor will not be permitted to donate the services and earnings of teams belonging to him to his infant son to avoid payment of his debts to a creditor for whom said infant son, with such teams, performs labor.

SERVICES OF MINOR—LABORER'S LIEN—CREDITORS.—A minor, who, with teams belonging to his father, plows the lands of a creditor of his said father, for the purpose of cultivating a crop thereon, may be entitled to a lien for his own personal services, if personally entitled thereto, but is not entitled to a lien for the services of said teams.

(Syllabus by the court.)

APPEAL from District Court, Latah County.

The facts are stated in the opinion.

Stewart S. Denning, for Appellant.

The point made by the defendant in this action is that although some of the states have held that if a laborer has a team, or any other person which to him is exempt on account of the party making a living for himself, or for himself and family, that a lien will sometimes be sustained for the work of the team as well as that of the laborer. But nowhere has it been

---

---

held that a laborer may hire or even receive a team for the purpose of working, and that a lien will obtain and prevail in favor of the said team to establish a lien. Among some of the authorities bearing on this point, are the following: *Little Rock etc. R. R. Co. v. Spencer,* 65 Ark. 183, 42 L. R. A. 334; *Tod v. Kentucky Union R. Co.,* 50 Fed. 341, 6 U. S. App. 186, 3 C. C. A. 60, 18 L. R. A. 305; *Balch v. New York etc. R. Co.,* 46 N. Y. 522; *Brusie v. Griffith,* 34 Cal. 302, 91 Am. Dec. 695, *Johnston v. Barrills,* 27 Or. 251, 50 Am. St. Rep. 717, 41 Pac. 656; *Seider's Appeal,* 46 Pa. St. 57; *Wentroth's Appeal,* 82 Pa. St. 469; *Campfield v. Lang,* 25 Fed. 128; *People v. Board of Police,* 75 N. Y. 39.

George G. Pickett, for Respondent.

"Can a farm laborer within the state of Idaho include in his laborer's lien for work and labor performed by him in tilling and cultivating lands the work of the horses, while the contract of hire specifically includes the work of himself and team at a specific price per day for his and their joint work?" (*Mohr v. Clark,* 3 Wash. Ter. 440, 19 Pac. 28; *Chicago etc. R. Co. v. Sturgis,* 44 Mich. 538, 7 N. W. 213; *Sears v. Lawrence,* 10 Wash. 368, 45 Am. St. Rep. 789, 38 Pac. 1049; *Branham v. Nye,* 9 Colo. App. 19, 47 Pac. 402; *Bolster v. Stocks,* 13 Wash. 460, 43 Pac. 532, 534, 1099.)

QUARLES, C. J.—This action was commenced by respondent, Frank J. Tuckey, a minor, by his guardian *ad litem,* Elias Tuckey, his father, to enforce a lien upon a certain crop raised by the appellant, in the cultivation of which it is claimed that said respondent, Frank J. Tuckey, performed work and labor with himself and with four horses at the agreed price of three dollars per day, amounting to the sum of sixty-three dollars and seventy-five cents, and for attorney's fees for enforcing said lien in the sum of forty-five dollars. The statement of said laborer's lien in writing was executed by said Elias Tuckey, as guardian *ad litem* of said Frank J. Tuckey, and duly verified by said guardian *ad litem,* and recorded in the office of the county recorder of Latah county on the eleventh day of May,

1901. The defendant answered, denying the material allegations of the complaint specifically, excepting the allegations set forth in paragraphs 7, 8, and 9 of the complaint, which allegations the said answer admitted, excepting it denies that forty-five dollars, or any other sum, is a reasonable attorney's fee to plaintiff in the action. The defendant sets forth in his answer the further defense that said Elias Tuckey, the father of the said Frank J. Tuckey, was indebted to defendant upon account of one hundred and fifty-one and one-half bushels of wheat sold and delivered by said defendant to said Elias Tuckey in October, 1897, at the agreed price of fifty-eight cents per bushel, making a total of eighty-eight dollars; that thereafter said Elias Tuckey paid a portion of said account for said wheat, to wit, thirty dollars, in the labor of his said son; that thereafter said Elias Tuckey promised and agreed that he would furnish to appellant the services of his said son, Frank J. Tuckey, and his said four horses, for the purpose of paying the balance due upon said account, and that pursuant to said agreement said Elias Tuckey did send his four horses and his said son, Frank J. Tuckey, a minor, to the farm of appellant to labor and work for the purpose of paying said balance of said account. The record shows that appellant agreed with said minor, Frank J. Tuckey, that the price of said labor should be the sum of three dollars per day for the labor of said Frank J. Tuckey and four horses; and that said Frank J. Tuckey, with said four horses, labored upon the farm of the appellant, plowing for the purpose of seeding the said crop described in the claim of said laborer's lien, for the period of twenty-one and one-fourth days, amounting to the sum of sixty-three dollars and seventy-five cents, no part of which has been paid, except the sum of one dollar, paid thereon in blacksmithing—sharpening a plow. The court made findings of fact in favor of the respondent, and conclusions of law to the effect that the respondent, Frank J. Tuckey, had a lien upon the said crop to the extent of sixty-two dollars and seventy-five cents, and for the further sum of one dollar and seventy-five cents for verifying and recording the said statement of lien, and the sum of forty dollars attorney's fees. From the decree based upon said findings appellant has ap-

pealed to this court. The defendant moved for a new trial upon a statement on motion for a new trial and upon a bill of exceptions, which contains the evidence introduced in the trial court, which motion for a new trial was denied, and the appellant also appeals from the order denying a new trial.

There are two questions in this case: 1. Was said work and labor performed by said minor, Frank J. Tuckey, for and on behalf of his father's account, or for and on behalf of his own account, working for his own benefit; and was that the understanding between the parties in this regard? 2. Even though it be held that said Frank J. Tuckey was entitled to compensation for the value of his own personal services, yet, under the circumstances, his father being indebted to appellant, and having agreed to pay appellant with the services of his son and horses, could the father donate the services of his horses to his infant son, and thus defeat the payment of the debt due from him to the appellant, his creditor?

It is shown in the evidence by both the father and mother of said minor, Frank J. Tuckey, that before performing the labor in question for appellant the said father informed the boy that he might have whatever he earned in the way of services performed; but a careful review of the evidence convinces us that notice to this effect was not published to the world, and that appellant did not understand that he was to pay the boy for such services. On the other hand, that it was the understanding beween the parties that the services of the said minor and of said horses should be credited upon the account which the father of said minor owed to the appellant, and in this respect the findings of the court are not supported by the evidence. But going beyond that question, it is a well-established rule of law, as well as of equity and justice, that men must be just before they are generous. Being indebted to appellant, said Elias Tuckey cannot, in law, be permitted to clandestinely donate the time and services of his horses, which is property, to his infant son, for the purpose of defeating the payment of his debts; hence it is palpable that no lien existed as against appellant for the value of the services of the said four horses performed in plowing for the appellant, but the same should be credited upon

the account due and owing from Elias Tuckey to appellant, if such was owing. At the trial the defendant offered evidence proving such indebtedness as alleged in his answer, and the court refused to permit him so to do. To this ruling of the court he duly excepted, and the action of the court in this regard constitutes the basis for one of the errors assigned. This action of the court was error prejudicial to the rights of defendant, and was reversible error. Appellant was entitled at the trial to prove said evidence. At the trial respondent offered to and was permitted to introduce in evidence that portion of the original record book in the county recorder's office of Latah county showing the record of said claim of lien, to which the appellant objected, and duly excepted. The admission of such record was not prejudicial error. The better practice would be, in case of the loss of the original, to introduce a certified copy of the record, instead of the original record.

If it be a fact that Elias Tuckey had emancipated his said son, Frank J. Tuckey, and that the latter was entitled to his personal earnings, and that these facts were known to the appellant, then said Frank J. Tuckey would have a lien for the value of his personal services, but not the services of said horses. But if said facts were unknown to appellant, and he received the said services of said Frank J. Tuckey with the understanding between him and the father of said Frank J. Tuckey that the latter, with said horses, was to work in payment of said account, then said Frank J. Tuckey would have no lien upon said crop, except as to any excess that may remain after payment of such account to appellant if same was due and owing to him.

Inasmuch as the judgment must be reversed on account of the errors herein pointed out, the case should be retried in the district court. Judgment reversed, and cause remanded to the district court for further proceedings consistent with the views expressed in this opinion. Costs of appeal awarded to the appellant.

Sullivan, J., concurs.

STOCKSLAGER, J., Dissenting.—I am unwilling to concur with my associates in the final conclusion reached in this case. For the purposes of my views I will adopt the statement of facts as shown by the opinion of my associates, and I further agree that only two questions are involved, and they are correctly stated in the opinion. Our statute does not require any kind of a publication or notice from the parent that a minor has been emancipated, and we take it that, if the appellant knew from any source that this boy had been given his time, and permitted to work for himself, and that his earnings should be his, that was sufficient notice. Section 2533 of our statute provides that "the wages of a minor employed in services may be paid him, unless within thirty days after the commencement of the service the parent or guardian entitled thereto gives the employer notice that he claims such wages." It is not claimed that any such notice was ever given by the parents of this minor to appellant, and hence he was entirely safe in settling with the young man, had he so desired. At folio 85 of the transcript, Elias Tuckey, the father and guardian *ad litem* of plaintiff, testified that: "About the last of March or first of April I was down to Lenville, at the blacksmith-shop, and Lovell asked me if Frank would come over and work for him, and I told him that any agreement he made with Frank was all right with me; Frank was his own boss, and he would make his own bargains. I had given him his time, and he could do as he was a mind to. That was in April, 1901. I had no further conversation with him regarding the matter. After this conversation I did not send my son over to see Lovell. The conversation which I have mentioned took place between myself and Mr. Lovell at the blacksmith-shop at Lenville, Idaho. This was a few days before my son undertook the work. During that conversation there was present Mr. Morning, Mr. Wealch, and Mr. Thomberg." On cross-examination he does not vary his statement, but at folio 95 says: "I gave my son his time a year ago last May. The reason I told him so was because Mr. Veatch was down there, and he wanted me to enter into a contract to drag some land or harrow it. He wanted to know if he could go; I says, 'You can do as you are a mind to. I will

give you your time, and you can take the horses, and work them for their keep,' as we had to buy grain, 'and, as long as I don't need them, you can work them, and whatever you earn is your own.' I told this to Mr. Veatch, of Moscow. I think I also told Mr. Spotswood that I had given Frank his time when he asked me if Frank was going to work for Mr. Veatch. I think I told Mr. Venigarholz a year ago last May. I presume I told several. First told the defendant that I had emancipated my son last March or April, when he came and asked me if Frank could come over." Frank J. Tuckey testified that it was finally agreed that he should have three dollars per day for himself and teams. "He agreed to pay cash—he said it would be cash. One day I asked Mr. Lovell for some money. He said he did not have any at present, but probably he could get some in a few days. He asked me to see Mr. Morning, if he had any money to loan him. I told him I didn't like to ask Morning for the money, and that was all that was said that day. Mr. Lovell told me once more that maybe he could get some money out of those pigs after a while. At the time he talked about paying me, when he said the pigs, was after I had worked possibly two weeks. This conversation, in which Lovell agreed to pay cash, was at Mr. Lovell's place, the last of March or first of April. When I went to work, I asked him how the pay would be—cash, or have to wait. He said cash. This was in 1901. Before this I had done work for Lovell, myself and plow and team of five horses. I had not fixed the price before I had commenced the work. I had nothing to do with that deal." C. E. Thomberg testfied that he was present, and heard the conversation between Tuckey and Lovell about the last of March or first of April, in regard to hiring Frank Tuckey, with certain horses, this year, at the blacksmith-shop at Lenville, Idaho. "At that time I heard Mr. Lovell ask Mr. Tuckey whether he could let Frank come over and work. Mr. Tuckey said that he had nothing to do with Frank; he could go over and work if he wanted to. Said he didn't have anything to do with him. Tuckey said he would have to come up and see Frank about working. I know of nothing more." On cross-examination he said: "What impresses my mind what that con-

versation was, I was standing there by Mr. Tuckey's hack—right by him. He had been in the shop, and I was watching the team, and when he came back I was standing there, and Lovell and Tuckey were talking. I overheard the conversation. Worked for Mr. Tuckey from May 7th until June 27th, and went back last fall, and have been there since. Have generally made that my headquarters the last year or so." Elias Tuckey was recalled, and testified that the conversation at the blacksmith-shop took place about four or five days before Frank Tuckey entered into the contract. Mr. Lovell testified: "Elias Tuckey purchased some wheat from me in October, 1897. He was to pay for it that fall, when he sold his wheat. He failed to do so. I spoke to him about it a time or two, and in the spring I told him I would give him the privilege of working it it out. He said he would like to do so; that he would let his boy come and work for me. Mr. Tuckey sent his son, with his team, to work as long as I wanted him that spring; and he told me he would send him again; that he would like him to work out the account. The first time Mr. Tuckey told me that whatever I could agree with Frank upon the rate per day would be satisfactory with him. I agreed upon a rate of two dollars and a half per day. He worked twelve days. Tuckey owed me eighty-eight dollars for the wheat in the first instance. All that Elias Tuckey said was that it would be applied on the account. Have repeatedly since then asked Mr. Tuckey to send Frank to work for me to finish paying the account, but never succeeded in getting him, until last spring, to agree to send Frank again. I spoke to him at the creamery meeting in the winter, and he said he didn't have much work to do this spring, and he thought he could let Frank come. Afterward I met him at the blacksmith-shop, and asked him if he was going to send Frank over to help me. He said yes; that he hadn't anything else to do. I told him I could commence very early. He said that would suit him. I asked him what he would work for this spring with his team. Elias said, 'Whatever arrangements you make with Frank will be satisfactory with me,' the same as he did when he worked for me before. When Frank came over, he wanted to know what I was going to pay. I told

him the same as before, two dollars and fifty cents per day. He didn't have much to say. Said he would let me know whether he could come or not. When he came back he said he could get more wages than that. I asked him how much he wanted. He said three dollars per day. I told him I would allow him three dollars per day if his father would let him come over with his team. He asked me for money after he had worked there. One Sunday morning he asked me for two dollars. I told him that I didn't have any money to give him. I settled up with Frank. He worked to the amount of sixty-three dollars and some cents. The first time I knew Frank was emancipated by his father was when the summons was served on me. Prior to this trial they never made any such statement to me. At the time I had this conversation at the blacksmith-shop there were a number standing around. I think no one heard the conversation between Tuckey and myself. Mr. Thomberg was in the seat with Elias Tuckey. The buggy was standing about a rod or two from the shop. Mr. Morning and Mr. Wealch was all I could recollect that were there in the courtroom. I have not subpoenaed them. After the work was done, the first demand for the new raise was made the next morning, after I settled with Frank and he went home. His father came to my place. Mr. Tuckey talked something about the work, and he says, 'Frank, you demand your pay for your work.' I asked Mr. Tuckey if he was not owing me yet. He said he was not. That was about all. I boarded Frank and his teams while he was at work." We are in full accord with the rule that men should be just before they are generous, but we think solemn contracts should be carried out, and that Mr. Lovell should not be permitted to defeat the claim of this young man for his hard earnings. If Elias Tuckey is indebted to Lovell, he should pay it; but the only evidence we have on this question is the evidence of Mr. Lovell, who says Mr. Tuckey denied any indebtedness to him. The father of Frank Tuckey had the right to allow his son to use his teams if he so desired, and he was entitled to his lien for his labor and the use of the teams.

I think this judgment should be affirmed.